WARD M. CANADAY, Appellant, v. MILLAR BRAINARD, JR., Administrator *de bonis non cum testamento annexo* of the estate of Millar Brainard, deceased, and SAMUEL VANCE, JR., Appellees.

(*August* 1, 1958.)

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, J. J., sitting.

*Edwin D. Steel, Jr., George T. Coulson* and *William S. Megonigal, Jr.,* (of Morris, Steel, Nichols and Arsht) for appellant.

*James R. Morford* and *Ernest S. Wilson, Jr.,* for appellees.

Supreme Court of the State of Delaware, No. 4, 1958.

SOUTHERLAND, C. J.:

This is a suit for brokers' commissions. It concerns the activities of two industrial brokers, Samuel Vance, Jr. and Millar Brainard, in attempting to effect a sale of the interest of Ward M. Canady, the defendant, in Willys-Overland Motors, Inc. (Brainard died before the suit was brought.)

The plaintiffs asserted that Vance and Brainard were employed by Canaday to find a purchaser for Canaday's holdings upon an understanding, either expressed or implied, that Canaday would pay them if successful; that Brainard did find such a purchaser in the Kaiser-Frazer Company; that the sale was consummated; and that Brainard was the procuring cause of the sale, or, alternatively, that Brainard was wrongfully prevented by Canaday from consummating the sale.

All these contentions were denied by Canaday.

The case was tried by jury. At the conclusion of the trial Canaday moved for a directed verdict. It was denied and the case was submitted to the jury. A verdict for plaintiffs in the sum of $168,640 was returned. A motion for a new trial was denied. Canaday appeals.

The principal contentions of the parties at the trial are renewed here. In the view we take of the case, however, it is necessary to consider only one question:

Was there any evidence from which the jury could find that Millar Brainard was the procuring cause of the sale?

The evidence on that point adduced by the plaintiffs below, viewed in its most favorable light, is as follows:

The defendant in the case is Ward M. Canaday. At the times with which we are concerned he was president and chairman of the board of Willys-Overland Motors, Inc. The business of Willys-Overland was the manufacture of motor vehicles. Canaday owned about 75% of the stock of a holding company, Empire Securities, Inc., which in turn owned more than a million shares of Willys stock. Thus a substantial part of Canaday's fortune was invested in the Willys enterprise.

In January of 1950 Canaday talked to Mr. C. Kenneth Baxter of the Donner corporation about his Willys investment. He was advanced in years and was disturbed about the future of his investment if anything happened to him. Baxter suggested that Canaday try to dispose of his interest in Willys and create a diversified investment portfolio. Canaday told Baxter that if the latter heard of anyone who had an interest in buying his "Willys-Overland stock" he and Baxter might talk about the matter further.

After his talk with Canaday Baxter told Samuel Vance, Jr., one of the plaintiffs, of the possibility that Canaday might sell his Willys investment. Vance is an industrial broker. Vance ar-

ranged a conference with Canaday. Canaday said that he wanted Vance to find a buyer for the stock, without disclosing that Canaday was willing to sell it and without putting a price upon it. During the year 1950 and during early 1951 Vance made several efforts to produce a purchaser, but with no success. One possible purchaser asked that Canaday name a price, but Canaday refused to do so.

In the spring of 1950 Canaday and officers of the Kaiser-Frazer Company engaged in negotiations looking to the merger of the two companies. They failed because Canaday insisted on a firm commitment to buy his holdings, and the Kaiser officials insisted that the commitment be conditioned upon the approval of the merger.

In early 1951 Vance had effected an association with Millar Brainard, now deceased, whose administrator is the other plaintiff below. Brainard was also an industrial broker. Vance told Brainard of the possibility of Canaday's selling his interest in Willys. Brainard, who knew Cyrus Eaton, of Otis & Co., talked to Eaton about it. Vance then arranged a meeting between Canaday and Brainard.

Canaday and Brainard met in Boston on April 7, 1951, and Brainard suggested Eaton as a possible purchaser. Canaday thought Eaton a logical purchaser, and saw a possibility of harmonizing various interests by settling the litigation between Eaton and the Kaiser-Frazer Company and putting Willys and Kaiser-Frazer together. Some talks between Eaton and Brainard occurred during the next two or three months, in the course of which the possible merger of Willys and Kaiser-Frazer was mentioned. Nothing came of these conversations.

On May 16, 1951 Canaday sailed for Europe. On June 12, 1951 Brainard sent him a memorandum embodying a plan of merging Willys and Kaiser-Frazer. Brainard thought that if the merger could be put through it would be possible thereafter to effect a sale of Canaday's holdings.

On July 25, 1951 Brainard called upon George Woods, chairman of the board of the First Boston Corporation, and financial adviser to the Kaisers. Brainard told Woods that he (Brainard) believed that Canaday had a real interest in trying to work out a combination between Willys and Kaiser-Frazer. Brainard asked Woods to inquire of Edgar Kaiser, president of Kaiser-Frazer, whether he too would be interested. Woods said he would do so.

Woods could not get into telephone communication with Edgar Kaiser, but talked to Trefethan, a vice president, about his talk with Brainard. Woods said to Trefethan that Canaday had "come up with a new mouth"—*i.e.*, was ready to deal with the problem of disposing of his interest in Willys in a new fashion. Trefethan said that he would report the Woods-Brainard conversation to Edgar Kaiser.

On July 31, the day Canaday returned to his office, Brainard reported to Canaday that he had a conversation with Woods; that Woods was really interested; and that what Woods wanted to do was to buy Canaday's stock in Empire Securities. It was arranged that Brainard should visit Canaday at the latter's farm at Woodstock, Vermont.

On August 8 Kaiser tried unsuccessfully to call Canaday on the telephone. On August 9 he talked to Canaday on the telephone.

On August 11 Brainard met with Canaday in Woodstock. From the evidence adduced by the plaintiffs it could be inferred that Canaday was much interested in the possible sale to Kaiser-Frazer and that he encouraged Brainard to keep working on it.

On August 13, however, Canaday telephoned Brainard. Canaday said that he had been thinking over their talk in Woodstock and did not want to spend any money on anyone trying to follow up the Kaisers; that he didn't think anything was to be gained by Brainard "peddling his stuff".

On the same day and also on August 15 Canaday called Kaiser. On August 22 and 28 Woods telephoned Canaday with respect to the Kaiser-Frazer matter. The record does not show what was said.

On September 5 Kaiser met Canaday in Toledo. They discussed the possibility of reactivating the prior discussions about putting together Willys and Kaiser-Frazer. The talk appears to have covered general ideas but not the details of any sale or merger.

At Canaday's request Kaiser returned to Toledo to look at the new Willys passenger car. It was Kaiser's belief that the car was not a vehicle that would sell in the price class and produce the volume that was required. He concluded that he did not wish to pursue further the discussions with Canaday.

No further discussion on the subject of a sale or of a merger of the companies occurred between Canaday and Frazer until January 1953. Canaday telephoned Woods in December 1951 and asked him to look at the new Willys car, but Woods declined because, as he testified, "our discussions were terminated".

In late 1951 and early 1952 discussions took place looking to a possible merger of Kaiser-Frazer with Consolidated Vultee Aircraft Corporation ("Convair"). Both companies were producing aircraft. These talks were initiated by a call on Kaiser from Mr. David Baird, who was apparently speaking on behalf of Mr. Floyd Odlum of the Atlas Corporation. Atlas owned a large block of Convair stock. Baird was the second largest stockholder of Willys, and appears to have acted for Odlum on occasion as an industrial broker. Meetings were held at Odlum's home in California and the discussions lasted a week or ten days. Representatives of Atlas and Kaiser-Frazer attended. The proposed merger was abandoned because Convair's board disapproved of it. Kaiser was notified of this in March, 1952.

During the next four or five months no negotiations or conversations were had with respect to the sale of Canaday's stock or any merger involving Willys.

In the early fall of 1952 Odlum proposed to Kaiser a "three-way deal" involving Willys, Atlas, and Kaiser-Frazer. Atlas was to acquire Willys, and the Willys assets were thereafter to be sold to a subsidiary of Kaiser-Frazer.

A necessary step in this proposed transaction was the purchase of Canaday's stock.

Neither Canaday nor any representative of Willys participated in these discussions. It would seem that he wished nothing to do with them, because in a letter to Vance dated October 10, 1952, Brainard said: "Mr. Canaday threw a fit when some people I talked to contacted Atlas."

The "three-way" talks came to nothing because Atlas was unable to obtain from Canaday any assurance of what he (Canaday), would be willing to do, and in December 1952, Odlum and Kaiser agreed that the idea should be definitely abandoned without any obligation on either side.

In the meantime an article had appeared in the Wall Street Journal of October 8, 1952, referring to the possible merger of Atlas, Convair and Kaiser-Frazer, and also mentioning Willys. Brainard called Canaday to inquire about the negotiations. Canaday said he did not think there was anything tangible enough to talk about.

Brainard called Canaday again on November 6 and asked how Kaiser-Frazer stood. Canaday said he did not know; that he had "let it alone."

On January 14, 1953, Trefethan, vice president of Kaiser-Frazer, prepared a plan for the purchase of the Willys assets by a subsidiary of Kaiser-Frazer. At about the same time Brown, Kaiser-Frazer's counsel, also prepared memoranda dealing with the same subject.

On January 15 Kaiser met with Canaday in Kaiser's office to discuss a plan relating to the production of automobile bodies for both companies. Canaday suggested that they pursue the idea

of putting the companies together. Kaiser agreed to consider it and to give Canaday a written proposal. This he did on January 21.

On February 3 Brainard's son, Snelling Brainard, and Mr. Whiteside, his lawyer, called to see Canaday in New York. Brainard was then ill with cancer. He died some months later.

Snelling Brainard asked Canaday whether there was any chance of the Kaiser-Frazer deal going through. Canaday replied that the deal was dead.

On February 7 Kaiser, Canaday and Mr. George Ritter met with some others at Ritter's home in Florida. Ritter was Canaday's personal lawyer and owned a substantial interest in Empire Securities Company. Ritter thought that the principle of Kaiser's plan was satisfactory, but that a payment in preferred stock of $15,000,000 of the purchase price for the Willys assets was not satisfactory.

Further and extended discussions followed. On March 23, 1953, a contract was signed providing for the sale of Willys assets to a subsidiary of Kaiser-Frazer for about $60,500,000. In late 1953, after the consummation of the sale Willys declared an optional $17 liquidating dividend. Empire Securities, holding 1,008,102 shares, elected not to take it. Willys changed its name to Overland Corporation and became a closed end investment trust.

The upshot of the matter was that Canaday disposed of his interest in Willys for a sum probably exceeding $17,000,000.

The foregoing is a summary of the evidence touching the essential question before us. It serves no purpose to discuss the evidence upon other issues. Numerous errors are assigned, but, as above indicated, the only question we need to consider is this:

Was there any evidence to justify the jury in finding that Millar Brainard was the procuring cause of the sale?

A broker may not recover commissions unless he is the procuring cause of the sale. *Slaughter v. Stafford, Del.,* 141 *A.* 2d 141. He is the procuring cause of a sale if his efforts bring his principal and the purchaser together and lead directly to the consummation of the transaction. 8 *Am. Jur. "Brokers",* § 172; *Restatement, Agency,* § 448. This is simple enough to state, but circumstances vary widely, and the rule is often difficult of application.

In cases where the negotiations do not progress promptly to a conclusion, but, after considerable delay, are finally satisfactorily concluded between the principal and the purchaser, close questions arise. In such cases the courts have evolved a subsidiary rule that in order for the broker to be the procuring cause of the sale it must appear that there was no substantial break in the negotiations. *Restatement, Agency,* § 448, comment d. *Slaughter v. Stafford, supra.*

Whether there was a "substantial break" in the negotiations depends not so much on lapse of time as upon the chain of circumstances—the question of causation. Ordinarily this is a question of fact for the jury, since its resolution must often depend on a choice of possible inferences. But if only one inference is possible from the admitted facts the court must resolve the question.

The trial court in this case submitted the question of "substantial break" to the jury under appropriate instructions. It also stated to the jury the contention of the plaintiffs that from August 1951 to March 1953 Canaday "was in direct contact with and negotiating with" Kaiser-Frazer, "and that there was no substantial break in the negotiations during that period". Thus both court and counsel recognized the pertinency of the "substantial break" rule.

We apply the rule to the facts before us.

Plaintiffs' case—the contention that Brainard was the procuring cause of the sale—is founded upon his call upon Woods

on July 25, 1951, and the subsequent reactivation of the Canaday-Kaiser discussions that followed almost immediately. Canaday and Kaiser had in 1950 come fairly close to a bargain, but negotiations failed and the jury could have found that they had been definitely abandoned. Hence Brainard, to use his own expression, "put the deal back on the track". Had Canaday and Kaiser closed in September, 1951, Brainard's case on this point would have been clear.

But, once again, negotiations were broken off. Not only so, but the discussions never even reached the question of terms. Kaiser concluded not to pursue the matter because of his dissatisfaction with the Willys automobile. His testimony is positive and uncontradicted, and is corroborated by Woods.

Moreover, Kaiser not only dropped the Willys matter but shortly thereafter, at the suggestion of Odlum, became interested in the possible merger with Convair. Neither Canaday nor Brainard had anything to do with this idea and the discussions in no way involved Willys. Plaintiffs assert in their brief that the Convair merger was embarked on to solve the cash problem presented by a Willys-Kaiser-Frazer merger. There is absolutely no testimony in the record that we have been able to find to support this assertion. Plaintiffs assert that Brainard undertook to keep Canaday informed of the Convair discussions. Again, the assertion is not supported by the record. Finally, plaintiffs suggest that "it may be" that it was Canaday who suggested to Brainard that Odlum's involvement in the Kaiser-Frazer situation might be profitable. No record reference is cited. It is pure speculation.

The Convair negotiations were definitely abandoned in March, 1952.

In the fall of 1952 occurred the "three-way" negotiations involving Atlas, Kaiser-Frazer and Willys. Canaday knew about these negotiations but neither he nor any representative of Willys participated in them. They failed in December, 1952,

because Odlum could not get any commitment from Canaday with respect to the sale of Canaday's holdings in Willys.

Now, during all these 15 months Brainard did nothing whatever on the Willys-Kaiser-Frazer matter, except for the telephone calls to Canaday about the "three-way" talks and the possibility that some suggestion of his was communicated to Odlum. Certainly there is no evidence that he did anything to reactivate the discussions between Kaiser and Canaday.

In January occurred the meeting between Kaiser and Canaday about the manufacture of bodies. In the course of this talk Canaday suggested that the two companies be put together. The final contract and sale followed.

There is no dispute about the chain of events above set forth. The Canaday-Kaiser negotiations were definitely dropped, and Kaiser engaged in discussions with others. We can see no possible escape from the conclusion that there was a "substantial break" in the negotiations, the sole contribution to which by Brainard was the bringing together again of Canaday and Kaiser. This meeting resulted in nothing— not even in a discussion about terms. Brainard had nothing to do with the resumption of the discussions in 1953. It follows that he was not the procuring cause of the sale.

Plaintiffs insist that the long lapse of time between the Canaday-Kaiser discussions in September of 1951 and the January, 1953 talk—16 months—is immaterial, because the consummation of the transaction was always dependent upon the removal of an obstacle to the sale, *viz.*, the large indebtedness of Kaiser-Frazer to the Reconstruction Finance Corporation. They attempt to buttress this theory (it is nothing more) with the assertion that the Convair merger was desirable to Kaiser-Frazer for this reason. There is no evidence of this, and in any event the Convair merger, as we have shown, had no connection with Willys-Overland.

It is also said that Odlum's memorandum to Kaiser-Frazer of December 18, 1952, shows that the RFC indebtedness was the

obstacle to the Willys-Kaiser-Frazer merger. This is not correct. Atlas, not Kaiser-Frazer, was to acquire Willys. The obstacle was Canaday's refusal to tell Odlum what he was willing to do.

Finally—and this is the sufficient answer to the "obstacle" theory—the abandonment by Kaiser of the Canaday-Kaiser discussions of September, 1951, was for another reason, as already stated. This is not merely a possible inference from the facts; it is the uncontradicted testimony upon the point.

One other contention of plaintiffs must be dealt with.

■ It is said that plaintiffs are entitled to recover the reasonable value of their services to Canaday because Canaday wrongfully prevented them from consummating the sale. As to Vance, he was so prevented, it is said, because Canaday never would put a price on his stock when Vance produced a possible purchaser. What of it? Canaday was not bound to do so. It may be regarded as an onerous condition for the broker to meet— as an extreme example of close and hard trading. If so, the broker does not have to try to meet the condition. But if he tries, he must abide by the principal's terms.

No authority is cited for the proposition that it is a wrong for a seller to refuse to name a price, and we think that none could be. Plaintiffs' authorities on "wrongful prevention" deal with cases of breach by the principal of bilateral contracts with brokers. See *Weiss v. Northern Dredge & Dock Co.*, 155 *Md*. 356, 142 *A*. 253. They are inapposite. The instant case is one of unilateral employment. The broker recovers nothing unless he produces a purchaser who meets the principal's terms.

As to Brainard, it is argued that Canaday's instructions to him in August of 1951, to the effect that Brainard was not to follow up the Kaiser-Frazer deal, amounted to a discharge of the broker in bad faith. It will be recalled that these instructions were given to Brainard during the course of Canaday's talks with Kaiser.

Now, if those talks had resulted in the sale that finally took place, and Canaday had refused to pay a commission, Brainard's claim of discharge in bad faith to avoid payment of commissions would probably have been made out. Certainly a jury could be permitted to pass upon it. See *Slaughter v. Stafford, supra,* and *Sibbald v. Bethlehem Iron Company,* 83 *N. Y.* 378, 9 *A. L. R.* 1194, cited and quoted from in the *Slaughter* case.

But no such case is made out here. As we have repeatedly said, the evidence is uncontradicted that nothing whatever came of the 1951 discussions, and the matter was definitely dropped. Indeed, the negotiations never progressed to the point where a successful outcome was approaching, since they never left the area of generalities.

Plaintiffs cannot recover on the theory that Canaday may have intended to close the deal himself and avoid payment of a commission, without also showing that he did close the deal as the result of their efforts. See *Restatement, Agency,* § 454.

A word must be said about Canaday's statement to Snelling Brainard in January, 1953, that the Kaiser-Frazer deal was dead —a flat misstatement of fact. However deceitful this may have been, Canaday at that time owed no *legal* duty to Brainard to advise him about the matter—much less to reemploy him in connection with it. It must be recalled that Brainard did not discover Kaiser-Frazer as a purchaser. He did not bring to Canaday and Kaiser a new proposal. His connection with the matter was, as before explained, limited to a reactivation in 1951 of the prior 1950 discussions. After they failed, he did nothing more, and contributed nothing to the second reactivation of negotiations in January of 1953.

The foregoing review of the uncontradicted evidence in this case compels the conclusion there was a substantial break in the Canaday-Kaiser negotiations; that the broker was not the procuring cause of the sale; and that the motion of the defendant for a directed verdict in his favor should have been granted.

One observation must be added. This was a long and keenly-contested trial. It began on February 18, 1957, and ended on March 22, 1957. The typewritten transcript of the testimony and proceedings runs to nearly 3,300 pages. Documentary exhibits number more than 200. Many important and difficult questions, in addition to the single one we have considered, were presented to the court below. It is not surprising that the trial judge should have submitted the whole case to the jury. The circumstances surrounding the trial of this long hard-fought law suit quite naturally led him to do so, since the defect in the plaintiff's proof was far from obvious. Indeed, it is fair to say that a careful study and analysis of the entire record is required to disclose that a vital element of plaintiff's case was missing.

The verdict must be set aside.

The cause is remanded to the Superior Court of New Castle County, with instructions to set aside the verdict and vacate the judgment, and to enter judgment for the defendant.