GREAT LAKES STEEL CORPORATION, a Delaware corporation, Defendant Below, Appellant, v. BUKAI BAYSOY, trading as Turkish Industrial Supply Company, Plaintiff Below, Appellee.

(*February* 17, 1960.)

SOUTHERLAND, Chief Justice, and WOLCOTT, Justice, and CAREY, Judge, sitting.

*David F. Anderson* (of Berl, Potter and Anderson) for appellant.

*George T. Coulson* (of Morris, Nichols, Arsht and Tunnell) for appellee.

Supreme Court of the State of Delaware, No. 52, 1959.

SOUTHERLAND, C. J.:

Bukai Baysoy, plaintiff below, sued Great Lakes Steel Corporation, defendant below, to recover a broker's commission in connection with the sale of certain steel Quonset buildings to the Office of Soil Products, a bureau of the Turkish Government, known as "Toprak". The case was tried before a jury, which returned a verdict for Baysoy of five per cent of the sale price of $1,505,000. Great Lakes appeals.

Great Lakes' principal contention is that the evidence was insufficient to support the verdict.

The facts proved on behalf of Baysoy, viewed in the light most favorable to him, made the following case:

In the year 1948 certain offices of the Turkish Government were interested in the purchase of steel buildings. Great Lakes was a manufacturer of such buildings. Baysoy was a broker who had associates or contacts in Turkey, Sukas and Muradoglu. Baysoy received from Great Lakes authority to submit quotations on a number of such buildings, his compensation to be five per cent "on any business that you may develop".

On December 21, 1948, Baysoy transmitted to two offices of the Turkish Government, the Ministry of Public Works and the Ministry of Agriculture, quotations that he had received from Great Lakes. Nothing came of this and in April, 1949, Great Lakes "closed out" its file on these quotations.

In August, 1949, Toprak invited bids on a number of steel buildings to be used for the storage of grain. Baysoy sent the proposal to Great Lakes, received quotations, and on September 4 sent the quotations to Toprak. In December Toprak adopted new specifications. Baysoy sent them to Great Lakes on December 23. He advised Johnson, Manager of Export Sales of Great Lakes, of certain recommendations of his associate, Sukas, with respect to the contents of the Great Lakes' bid. On January 8, 1950, Baysoy submitted another bid to Toprak. During February and March, 1950, additional bids were submitted in the same manner.

In April Mr. Yaruz Ustun, Chief Engineer of Toprak, visited the United States. Baysoy arranged for Great Lakes to extend an invitation to Ustun to visit the Great Lakes plant at Detroit.

Further correspondence followed between Johnson and Baysoy concerning the matter. In May Ustun, who had returned to Turkey, again visited the United States and Baysoy took him on a trip of inspection, during which Ustun was shown a large number of Quonset buildings used for the storage of grain.

In July Sukas reported to Baysoy that the purchase by Toprak must await establishment of credit with the United States.

On October 27, 1950, Toprak advised Sukas that it was ready to purchase the buildings and offered to send him the specifications. Sukas obtained them and sent them to Baysoy who communicated with Great Lakes. A new bid was prepared and sent on December 6. At the same time Baysoy wrote to Ustun urging him to give careful consideration to the specifications for Great Lakes' Quonset buildings, which differed in some respects from the Turkish specifications. Baysoy explained at some length the widespread use of the Quonset type of building by the United States Government and others.

Nothing came of all this, because Toprak was then unwilling to waive its specifications.

In March, 1951, Baysoy wrote Igun, the Director of Materials of Toprak, inquiring what had been done with his proposals, whether they had been considered, and whether he could hope for an order in the future.

On March 27, 1951, Igun replied. He told Baysoy that the Great Lakes' bid had been rejected by the Technical Bureau because of the difference in the specifications. Igun added that the bids had aroused considerable interest, and that the Director General, Mumtaz Rek, had examined the catalogues, photographs and specifications, and "found them worth while".

Igun also wrote that because of increased grain production additional storage buildings would probably be required in the very near future, and that there was great hope that a decision would be made in favor of the type of shed produced by Great Lakes.

Baysoy reported this to Johnson, who said—"We have to wait until the future."

In November, 1951, Baysoy received information from Muradoglu that Toprak had definitely approved the Quonset type of buildings and that the Turkish Government had approved a request for a "dollar allowance" to purchase these buildings. Baysoy on November 18 communicated this information to Johnson. He also wrote Johnson that the Turkish Government was negotiating with the United States Mutual Security Administration to obtain the money, but that even if these funds were not forthcoming the Turkish Government would make the purchase. He also wrote that a mission from Toprak would come to the United States in the following February or March to negotiate with the United States Government. Baysoy received no reply to this letter. Johnson testified that he never received it.

Muradoglu testified that from 1949 to 1952 he was frequently in contact with Toprak officials, including Mr. Rek, and urged them to purchase the Great Lakes type of building.

On April 4, 1952, the Mutual Security Administration received from its Turkish mission an inquiry relating to Quonset type buildings. It asked the names of companies that could supply them. On April 14 Mutual Security Administration cabled five names of possible suppliers, including Great Lakes.

On April 19 Toprak cabled Great Lakes asking for prices.

On May 3 the Turkish authorities submitted to Mutual Security Administration a project application in which they "talked of the experience which the United States had had in this type of storage."

On May 9 a meeting was held in the Department of Agriculture, attended by representatives of the Mutual Security Administration of the Department of Agriculture, and of certain steel companies, and by Mr. Alpar, head of the Turkish Economics Mission in Washington.

On May 28 Alpar told Van Leer, of Great Lakes, that the decisions upon awarding the contracts would be made in Turkey, but that in order to save time representatives of the Turkish Government would fly to the United States to sign the contracts. Alpar testified to the same effect. The Turkish representatives, headed by Mr. Rek, came to the United States in June.

On June 3 Baysoy wrote Johnson that his associates had informed him that the Turkish Government had allotted $2,000,000 for the purchase of buildings, and that a mission would arrive in late June or early July to complete the purchase. On July 12 a contract for the purchase from Great Lakes of 355 buildings (the larger part of the entire order) was executed.

On July 31 Igun wrote to Baysoy giving instructions for the shipping of the buildings. On August 6 Baysoy sent these to Johnson.

Johnson denied receiving Baysoy's letters of June 3 and August 6.

The foregoing sequence of events is largely established by the pertinent correspondence.

Great Lakes refused to pay any commission to Baysoy, claiming that the sale of July 12 was not developed by Baysoy, and that all brokerage services in the transaction were rendered by one Soker, to whom it had paid a commission of $50,132. Baysoy in 1953 undertook to obtain from Toprak corroboration of his claim. He wrote Torgut Keretli, Director of Materials, who advised him (in effect) that Toprak's records showed that "no other firm before you had introduced to us the Great Lakes Steel Corporation and the steel sheds of the Quonset semiarch type produced by that firm."

Later letters rogatory issued to take Keretli's testimony, and he affirmed the correctness of this statement.

Mention should be made of the facts concerning Soker's connection with the sale.

On April 8, 1952, Soker's associate, Mohammed Zia, wrote Great Lakes that he had received information that the Turkish Government would shortly be in the market to purchase steel buildings, and that he did not know of a better source than Great Lakes. He solicited a permanent representation of Great Lakes in Turkey, and suggested Great Lakes reply to Soker, who was an engineer specializing in Turkish Government contracts. Correspondence between Soker, Zia, and Great Lakes followed. On May 23 Soker wrote that a commission was absolutely essential "to meet certain commitments in connection with this business which it is necessary not only to safeguard this business but will instill future interests in this market."

On June 6 Soker cabled Great Lakes that Sukas, representing Turkish Industrial Supply Co., had stated that that Supply Company represented Great Lakes. Soker asked Great Lakes to clarify the position and "prevent interference". On June 9 Great Lakes cabled Soker that neither Sukas nor Turkish Industrial Supply Company had ever represented it in Turkey, and authorized Soker to refute the claim. The cable said that Great Lakes' only relation with that company was two years ago "and no arrangement exists".

Great Lakes did not inform Toprak or Baysoy of its advice to Soker.

Johnson of Great Lakes, asked about Soker, said that he questioned Mr. Rek when the latter arrived "and he, of course, knew Soker very well".

Defendant's principal ground of appeal is that the evidence did not support the verdict. It urges that (1) Baysoy had nothing to do with the closing of the contract, which was negotiated, it says, through the good offices of the United States federal authorities; and (2) that the broker's commissions, if any were payable, were earned by Soker.

The general principles of law respecting the right of a broker to recover commissions from his principal are summar-

ized in *Canaday v. Brainard,* 1 *Storey* 226, 144 *A.* 2d 240. The broker must be the procuring cause of the sale, that is, his efforts must bring the parties together and lead directly to the consummation of the transaction. In cases where the negotiations do not progress promptly to a conclusion, but are finally concluded between the principal and the purchaser, close questions arise, and the answer may well depend upon whether there has been a substantial break in the negotiations. This is ordinarily a question of fact for the jury, because, as we said in the *Canaday* case, its resolution must often depend upon a choice of possible inferences.

In the *Canaday* case we held that only one inference was possible—the uncontradicted evidence showed a substantial break in the negotiations. In the instant case we think that two inferences on this point were possible and that therefore the question was one for the jury.

The jury could have reasonably found the following:

(1) Great Lakes and Toprak were brought together by Baysoy.

(2) Upon the failure of the first series of Great Lakes bids, Toprak manifested continued interest in the Great Lakes product, based on the information received from Baysoy, and indicated that new bids would in the near future be invited for additional buildings.

(3) Great Lakes, upon learning of this, took a waiting position and did not at that time or any other time revoke Baysoy's authority.

(4) Baysoy's associate or friend, Muradoglu, kept in touch with the executives of Toprak during the period from 1950 to May 1952, and urged the approval of the Great Lakes type of building.

(5) During the later part of 1951, the Toprak engineers abandoned their objection to the Great Lakes type of building

and approved it. Toprak then decided to buy these or similar type buildings as soon as funds were available.

(6) Having decided to make the purchase, Toprak cabled the Mutual Security Administration in April for information concerning possible suppliers, and about two weeks later cabled Great Lakes for quotations. Toprak's project application to Mutual Security Administration in May might reasonably imply that Toprak had been impressed with Baysoy's information that Quonset buildings had been approved by the United States authorities.

(7) The efforts of Baysoy and Muradoglu were instrumental in inducing Toprak to abandon its objections to the Quonset buildings.

(8) The decision to make the purchase was arrived at in Turkey, and the function of the purchasing commission was to work out a definitive contract. The fact that Baysoy did not participate in the working out of the contract was unimportant.

(9) Baysoy reported to Great Lakes that the Commission would come to the United States to complete the purchase.

(10) No other broker was instrumental in bringing the parties together. Soker injected himself into the matter after the effective work had been done.

Defendant would challenge some of these possible findings—particularly that finding that the real decision was made in Turkey. But the evidence, above set forth in detail, affords support to the finding.

Further, the contention that the uncontradicted evidence shows a substantial break in the negotiations—from December 1950 to the spring of 1952—is not sound. Again, plaintiff's contention is supported by some competent evidence, and the issue was one for the jury.

One other point may be noted. The jury might reasonably have rejected Great Lakes' testimony that it did not receive any of Baysoy's letters, particularly since Great Lakes offered no explanation of the source of its shipping instructions.

Although the trier of facts might also reasonably have reached the contrary verdict, we cannot disturb its finding.

Defendant's principal contention must fail.

■■ Great Lakes' other contentions are that certain evidence was improperly admitted, and that the trial court erred in giving a supplemental instruction to the jury.

It is said that all the evidence relating to Baysoy's unsuccessful efforts in the years 1948, 1949 and 1950 was immaterial, and that its admission was highly prejudicial to defendant.

This evidence falls into two classes.

First, evidence concerning the 1948 bids to the Ministry of Public Works and the Ministry of Agriculture. This evidence related to one transaction only, and was offered for the limited purpose of showing the relationship between the parties. Moreover the prospective purchasers, like Toprak, were agencies of the Turkish Government. We think that the admission of this evidence was justified and that defendant was not prejudiced. We agree with defendant's counsel that evidence of a broker's unsuccessful efforts with persons other than the ultimate purchaser should be limited to a very few examples, and a broker should not be permitted, on the pretext of showing continued employment, to exploit the details of unsuccessful efforts to such an extent that the jury may be tempted to reward him for his time and labor. But nothing of that sort occurred here.

■ Second, objection is made to the admission of the unsuccessful efforts with Toprak in 1949 and 1950. Since these were negotiations with the ultimate purchaser, they were clearly admissible if they could be connected with the ultimate sale.

Great Lakes insists that they were not so connected. This is but a reiteration in another form of the contention that the uncontradicted evidence shows a substantial break in the negotiation—a contention we have already dealt with and rejected.

■ Defendant objects particularly to the Igun correspondence of March, 1951. We think that it was admissible to show the continuity of Baysoy's efforts and the continuing interest of Toprak in the purchase of Great Lakes buildings. The hearsay rule does not apply. *George A. Fuller Co. v. Ford*, 5 *Cir.*, 63 *F.* 2d 889; *McDonald v. Smith*, 99 *Minn.* 42, 108 *N. W.* 291; *Peck v. Foote*, 147 *A.* 109, 7 *N. J. Misc.* 672. The letters do contain other matter, some of it self-serving, but no special instruction was requested upon this point. Great Lakes' argument that Igun's letter was "personal" and not official we do not follow. Igun was Director of Materials of Toprak and wrote on his official letterhead in that capacity.

Third, objection is made to the admission of what is called "Post Sale Evidence".

■ It is said that the correspondence in July and August of 1952 relating to shipping instructions was inadmissible because the sale had already been consummated. Shipping instructions were, of course, pertinent to the performance of the contract of sale. Toprak's letter to Baysoy, and Baysoy's letter to Johnson, were not only a part of the transaction, but tended to confirm Baysoy's claim to have been the agent who had procured the sale.

■ It is also said that Keretli's letters in 1953 were erroneously admitted. Standing alone, they were probably inadmissible; but Keretli's testimony, above referred to, supplied the ground for this admission.

Defendant argues that Keretli had no personal knowledge of the matter, and merely testified to an examination of the office files by a subordinate. This objection is not well taken.

His testimony was that an examination of his official files had been made under his direction, and disclosed no other source than Baysoy of the information respecting Great Lakes buildings. The general rule is that the witness must have personal knowledge of the matter to which he testifies, but an exception is recognized in the case of public records in the custody of official successors. 2 *Wigmore on Evidence*, § 665.

Finally, defendant objects to the action of the trial judge in recalling the jury, after it had been charged, in order to supplement the charge with an instruction that had been inadvertently omitted. This was clearly within the discretion of the trial court.

The supplemental instruction was as follows:

"Where the agent is the procuring or effective cause of the transaction which he was authorized to negotiate he is entitled to his commission irrespective of the fact that the principal himself, or through others, might have intervened and actually completed the final act of negotiation."

The record indicates that counsel for both parties had agreed on this instruction as part of the charge. At all events, it was not erroneous. If the agent is the procuring cause of the sale, the fact that the principal concludes it himself cannot destroy the agent's right to a commission. The instruction was correct.

We find no error in the record, and the judgment of the Superior Court is affirmed.