**A.I.C. LIMITED, Plaintiff,**

v.

**MAPCO PETROLEUM INC., Defendant.**

**Civ. A. No. 88–694–JLL.**

United States District Court,
D. Delaware.

April 5, 1989.

Roderick R. McKelvie and Lawrence C. Ashby of Ashby, McKelvie & Geddes, Wilmington, Del., and James L. Armour, John H. McElhaney and Michael H. Collins of Locke Purnell Rain Harrell, P.C., Dallas, Tex., of counsel, for plaintiff.

Donald E. Reid of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Louis C. Lustenberger, Jr., Stephen D. Houck and George R. Hinckley, Jr., of Donovan Leisure Newton & Irvine, New York City, of counsel, for defendant.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

In this diversity action, plaintiff A.I.C. Limited ("AIC"), a corporation organized under the laws of Nigeria, accuses defendant Mapco Petroleum Inc. ("Mapco"), a Delaware corporation headquartered in Tulsa, Oklahoma, of breaching a contract executed by the parties on October 15, 1986. (*See* Docket Item ["D.I."] 1 [Complaint].)

The contract, a single-spaced 13–page typewritten document, is fundamentally a brokerage arrangement. By its terms, AIC was retained to act on Mapco's behalf in exploring and negotiating certain possible transactions between Mapco and designated third parties.[1] In essence, AIC alleges that Mapco wrongfully prevented AIC from performing services and thus from earning compensation potentially available to it under the contract.

Presently before the Court is defendant's motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. (D.I. 15.) In addition, the parties have locked horns in a battle over various discovery matters.[2]

For the reasons set forth in this Memorandum Opinion, the Court will grant Mapco's motion to dismiss the Complaint in its entirety for failure to state a claim. Consequently, the parties' squabbling over discovery becomes moot, and the motions relating thereto will be denied.

## I. THE CONTRACT

AIC and Mapco are the only parties to the contract at issue here. Part I. of this Opinion highlights various provisions of the contract insofar as they are pertinent to the motions now before the Court.

### A. *General Terms*

By the terms of the contract, AIC was engaged by Mapco to act as Mapco's representative and consultant in negotiating certain contemplated transactions involving Mapco and specified third parties. In the interest of clarity, the contract will be referred to throughout this Opinion as the "consulting agreement." The consulting agreement appears in the record as an exhibit attached to the Complaint.[3] (*See* D.I. 1, Ex. A.)

---

1. In particular, the third parties were to be the Nigerian Government and/or the Nigerian National Petroleum Corporation ("NNPC").

2. (*See* D.I. 15; D.I. 16; D.I. 21.) The discovery difficulties stem in large part from the apparent inability of AIC's chairman, a Nigerian national named Harry A. Akande, to gain entry into the United States for purposes of submitting to a

deposition. (*See* D.I. 29.) Plaintiff maintains that Mr. Akande's visa problems are temporary.

3. "A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Rule 10(c), Fed.R.Civ.P. Accordingly, the Court may properly examine the language of the consulting agreement in considering the sufficiency of the Complaint on a motion to dismiss. *See American Original Corp. v.*

Pursuant to the consulting agreement, AIC undertook to represent Mapco during the negotiation of certain prospective transactions involving Mapco and designated third parties. These prospective transactions underlying the consulting agreement fall into two categories. The first category contemplated a two-part transaction, by which: (1) Mapco would sell a minority interest in its refining and marketing assets located in the United States,[4] and (2) in return, Mapco would receive a long-term supply of crude oil.[5] (D.I. 1, Ex. A at 1–2, 6–7.) This first transaction category shall be referred to as the proposed "asset sale." The consulting agreement specifically contemplated that the Nigerian Government and/or NNPC would purchase the interest in Mapco's U.S. assets, and would also provide the long-term source of oil for Mapco.

The second transaction category contemplated by the consulting agreement involved obtaining a short-term oil supply for Mapco. For purposes of identification, the Court will refer to this second transaction type as a "short-term supply contract." The other party to any short-term supply contract with Mapco was to be NNPC. (D.I. 1, Ex. A at 3.) The short-term supply contract was to be formed if necessary "to assist in accomplishing" and "as a prelude to" the proposed asset sale transaction. (*Id.*)

### B. *AIC's Remuneration*

The consulting agreement provides in no uncertain terms that AIC would be entitled to compensation for its services if and only if Mapco actually entered into one or both of the contemplated transactions.

> Except in the event NNPC and [Mapco] execute a [short-term] supply contract ..., [Mapco] shall not be liable for nor be required to pay AIC any fees, compensation or reimbursement of any nature whatsoever prior to the successful closing of the [proposed asset sale transaction]. If no closing ever takes place, [Mapco] shall have no payment liability or obligation whatsoever to AIC.

(D.I. 1, Ex. A at 7.) AIC's compensation, if any, under the consulting agreement therefore depended upon Mapco consummating either a short-term supply contract or the proposed asset sale transaction, or both. These possibilities, and the compensation appropriate in each circumstance, will be considered in turn.

The Court shall first recite the terms of AIC's compensation attendant upon formation of a short-term supply contract. The consulting agreement calls for the payment of commissions by Mapco to AIC—at the rate of $.045 per barrel of oil—on any shipments made under a short-term supply contract between NNPC and Mapco. (D.I. 1, Ex. A at 6.) Payments of AIC's commissions were to be made thirty days after the bill of lading date for each shipment. (*Id.*) Upon termination of the consulting agreement, Mapco's obligation to make continuing commission payments to AIC would cease immediately.[6] If, subsequent to forming a short-term supply contract, Mapco entered into the contemplated asset sale transaction with its corresponding provision for a long-term oil supply, then the short-term supply contract was to be sub-

---

*Legend, Inc.,* 652 F.Supp. 962, 965 (D.Del.1986); 2A J. Moore, J.D. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 12.07[2.–5], at pp. 12–67 to 12–68 (2d ed. 1987).

**4.** More specifically, Mapco was considering the sale of an interest in its refinery located in Memphis, Tennessee, and in its retail marketing operations located in the continental United States, exclusive of Alaska. (D.I. 1, Ex. A at 1–2.) Any interest to be sold by Mapco was not to exceed 49%. (*Id.*)

**5.** Securing a long-term oil supply for Mapco was an essential element of the proposed transaction. (D.I. 1, Ex. A at 1, 3.)

**6.** "If this [Consulting] Agreement is terminated ..., then [Mapco] shall have no obligation to pay to AIC any amount not already paid by [Mapco]." (D.I. 1, Ex. A at 10.)

Mapco's termination of the consulting agreement lies at the heart of this lawsuit. The express provisions of the consulting agreement relating to termination, as well as the steps taken by Mapco to terminate the agreement in reliance upon those express provisions, are treated extensively below. *See* Parts I.D. and II. of this Opinion, *infra.*

sumed within the long-term supply provision.[7] From such point onward, AIC's commissions would be computed as under the proposed asset sale transaction.

In the event that the proposed asset sale transaction involving Mapco and the Nigerian Government and/or NNPC was executed, the consulting agreement provides for three concurrent forms of compensation payable to AIC. First, AIC would be entitled to a fee of $.045 per barrel for oil shipped to Mapco as part of the transaction's long-term oil supply provision. (D.I. 1, Ex. A at 7.) Such fee is at the same rate as provided for in the case of a short-term supply contract, and is payable in a like manner—that is, 30 days after the bill of lading date. (*Id.*)

Additionally, if the proposed asset sale transaction was formed, the consulting agreement calls for a commission payable to AIC in an amount equal to 10% of the consideration received by Mapco for selling the interest in its U.S. assets. (*Id.* at 6.) The measure of consideration received by Mapco, which forms the basis for AIC's commission, excludes the value of any oil received by Mapco under the long-term supply provision. (*Id.*)

The third and final form of compensation to AIC would consist of an option to purchase an interest of up to 10% in Mapco's U.S. refining and marketing assets. (D.I. 1, Ex. A. at 2–3.) AIC's purchase option, however, was subject to at least three preconditions. Most obviously, AIC would have no purchase option unless and until Mapco agreed to the contemplated asset sale transaction (including a provision for a

long-term supply of oil) with either the Nigerian Government and/or NNPC.[8] (*Id.* at 3.)

The second condition upon AIC's purchase option was that the combined interest of AIC, the Nigerian Government, and NNPC in Mapco's U.S. refining and marketing assets after the asset sale transaction and after the exercise of AIC's purchase option, was not to exceed 49%. (*Id.* at 2.)

The consulting agreement also contains a third condition precedent to AIC's purchase option. AIC's purchase option could be exercised only if the Nigerian Government and/or NNPC did not object. (*Id.* at 2–3.)

C. *Mapco's Right to Refrain from Entering Into the Contemplated Transactions*

The Court has heretofore described AIC's remuneration under the consulting agreement, and the fact that such compensation was owed to AIC only if Mapco actually entered one or more of the contemplated transactions underlying the consulting agreement. Given these facts, perhaps the most striking feature of the consulting agreement is that Mapco had absolutely no obligation to enter into any of the contemplated transactions.

The most pointed provision to this effect is the following: "[N]othing in this paragraph or Agreement requires [Mapco] to enter into any agreement with the Nigerian Government and/or NNPC or to sell any or all of its Refining and Marketing Assets." (D.I. 1, Ex. A at 2.)[9] This provision of the

---

7. "[I]n the event [that the contemplated asset sale transaction] occurs, the [short-term supply] contract shall be modified, on terms acceptable to [Mapco], *to become the secure long-term crude oil supply agreement that is part of the consideration for* [the asset sale transaction]." (D.I. 1, Ex. A at 3.)

8. The consulting agreement is silent as to the price at which AIC's purchase option might be exercised. Apparently the price would be subject to Mapco's approval. If so, this is but another aspect of the first condition precedent to AIC's purchase option—namely, Mapco's approval of the transaction.

9. The consulting agreement also states that AIC shall:

act as exclusive representative or consultant for [Mapco] in dealings with the Nigerian Government and NNPC in connection with [Mapco's] efforts to sell a part of the Refining and Marketing Assets and obtain a secure long-term crude oil supply for [Mapco's] Memphis Refinery *on terms acceptable to [Mapco]....*

(D.I. 1, Ex. A at 3 [emphasis added].) While requiring that the asset sale be "on terms acceptable to Mapco," the consulting agreement does not specify what terms Mapco would be willing to accept.

consulting agreement makes plain to any reader with even a rudimentary knowledge of the English language that Mapco had complete discretion to decline to form the proposed asset sale transaction. Likewise Mapco was perfectly free to refrain from entering into a short-term supply contract.

A logical corollary to the foregoing is that if Mapco had the right not to consummate the contemplated transactions, then clearly Mapco could not be forced by AIC into such transactions against its will. This logic is borne out by the explicit terms of the consulting agreement.

> It is expressly agreed that AIC will be acting as representative for and consultant to, but not as agent for, [Mapco]. AIC shall have no authority to act for, or to bind [Mapco] in any way....

(D.I. 1, Ex. A at 2.)

### D. *Termination of the Contract*

Two full single-spaced pages of the consulting agreement are devoted to the issue of its duration and the grounds for its termination. In default of the applicability of any of the termination provisions, the consulting agreement was to last for two years. "This Agreement shall continue for a period of twenty-four months from the date it is executed...."[10] (D.I. 1, Ex. A at 8.)

The consulting agreement sets forth numerous ways in which it may be terminated. Relevant to the instant motion to dismiss is the following:

> [E]ither party hereto may terminate this [Consulting] Agreement *with or without cause* as follows:
>
>   \*    \*    \*    \*    \*    \*
>
> c. if the successful closing of the agreement for the partial sale of the Refining and Marketing Assets and the pro-

curement of a secure [long-term] supply of crude oil has not occurred by the close of business London time on the 730th day following the date the [Consulting] Agreement is executed by AIC. ...

(D.I. 1, Ex. A at 8 [emphasis added].)

At least two noteworthy consequences follow from termination of the consulting agreement. First, immediately upon termination of the consulting agreement Mapco would have no ongoing duty to pay any further compensation to AIC.[11] Second, termination required AIC to "immediately discontinue any and all representation direct or implied on behalf of [Mapco]." (D.I. 1, Ex. A at 2.)

### E. *Miscellaneous Provisions*

Several other provisions of the consulting agreement warrant brief mention at this point. The agreement contains a choice of law provision, mandating that any disputes be resolved under Delaware law. (D.I. 1, Ex. A at 13.) It also includes a choice of forum clause. "The parties hereto agree to bring any action in and to submit to the jurisdiction of the federal or state courts for the State of Delaware." (*Id.*)

Finally, the consulting agreement contains an integration clause which precludes resort to parol evidence in construing unambiguous provisions of the contract.[12] "AIC and [Mapco] mutually agree to enter into the [consulting] agreement ... and agree that the following terms and conditions constitute the entire Agreement between AIC and [Mapco] and may not be modified in any way except by a written document duly executed by both parties."

**10.** The consulting agreement also provided that it might be extended, for a period of up to sixty additional months, in the event that Mapco entered into the contemplated asset sale transaction prior to termination of the consulting agreement. (D.I. 1, Ex. A at 8.)

**11.** *See supra* note 6 and accompanying text. *See also* D.I. 1, Ex. A at 7 ("In the event this [Consulting] Agreement is terminated ..., besides any other legal remedies available to

[Mapco], AIC agrees to forfeit and [Mapco] shall not have to pay AIC the per barrel fee on any barrels [Mapco] lifts and exports after the date of termination of the Agreement.").

**12.** *See, e.g., Auerbach v. Earth Energy Systems, Inc.,* 1988 WL 39982, at 9 (Del.Ch. April 26, 1988); *Reeder v. Sanford School, Inc.,* 397 A.2d 139, 141 (Del.Super.1979); *Restatement (Second) of Contracts* § 216(1) (1979).

(D.I. 1, Ex. A at 1.) [13]

## II. ALLEGATIONS IN THE COMPLAINT

The consulting agreement between AIC and Mapco was executed and became effective on October 15, 1986. (D.I. 1, Ex. A at 8, 13.) There is no allegation that Mapco ever consummated the proposed asset sale transaction contemplated by the consulting agreement. (*See* D.I. 1 at ¶¶ 12–14, 21, 24.) Indeed AIC alleges that negotiations to that end—between Mapco and the Nigerian Government and NNPC—continue as of the commencement of this action and beyond. (*See* D.I. 1 at ¶¶ 9, 13; D.I. 26 at 5, 19–20.)

AIC's Complaint avers that Mapco did form a short-term supply contract as contemplated in the consulting agreement. (D.I. 1 at ¶¶ 8, 17.) The Complaint also states that Mapco paid AIC the requisite fee of $.045 per barrel on oil shipments pursuant to the short-term supply contract, as called for by the consulting agreement,[14] but that such payments ceased in mid–October, 1988. (D.I. 1 at ¶ 17.) Mid–October, 1988, refers more specifically to October 14, 1988. On that date, which is twenty-four months after execution of the consulting agreement, Mapco notified AIC in writing that the consulting agreement was terminated[15] effective at once. (D.I. 1, Ex. B.)[16] AIC alleges that Mapco has made no payments to AIC since mid–October, 1988. (D.I. 1 at ¶ 17.)

On December 13, 1988, AIC filed its Complaint in the instant action. (*See* D.I. 1.) The Complaint, which sounds in five counts, alleges causes of action which are divisible into two distinct classes. The first class, consisting of Counts I, III, IV, and V, accuses Mapco of breaching terms of the consulting agreement relative to the contemplated asset sale transaction. The second class is comprised of Count II, which concerns the parties' rights and duties under the consulting agreement with respect to the short-term supply contract.

### A. *Counts Relating to the Contemplated Asset Sale Transaction*

As to the first class, the gist of AIC's contentions are as follows. It is claimed that Mapco interfered, in some unspecified manner, with AIC's performance under the consulting agreement. (D.I. 1 at ¶¶ 9, 12–14, 21, 24.) As a result thereof, the contemplated asset sale transaction was not consummated within the two-year term of the consulting agreement. It is said that AIC was thereby denied the compensation to which it would otherwise have been entitled. The Complaint alleges that Mapco acted to "frustrat[e] and prevent[ ] AIC, Mapco's exclusive representative in Nigeria, from performing, and thus earning the agreed upon fee...." (D.I. 1 at ¶ 13.)

As noted above, four of the Complaint's five counts relate to the contemplated asset sale transaction. Count I requests a declaration by the Court that *if* Mapco should conclude, in the future, an asset sale transaction as contemplated by the consulting agreement, then AIC would be entitled to receive fees and commissions as if the consulting agreement were still in effect.[17] (D.I. 2 at ¶¶ 10–15.)

---

**13.** (*See also* D.I. 1, Ex. A at 13 ["Any and all prior agreements between the parties hereto are declared null and void and of no further force and effect."].)

**14.** *See* Part I.B. of this Opinion (*AIC's Remuneration*), *supra.*

**15.** *See* Part I.D. of this Opinion, *supra,* for a discussion of the consulting agreement's termination provisions.

**16.** As with the consulting agreement itself, the notice of its termination was attached as an exhibit to the Complaint. *See supra* note 3 and accompanying text.

**17.** In particular, AIC demands a commission equal to 10% of the consideration received by Mapco—exclusive of the value of oil to be delivered under a long-term supply contract—upon the sale of an interest in Mapco's U.S. refining and marketing assets. Additionally, AIC demands a fee of $.045 per barrel of crude oil received as part of the secure long-term supply. *See* Part I.B. of this Opinion (*AIC's Remuneration*), *supra.*

Count III,[18] like Count I, also requests declaratory relief. Count III asks the Court to declare that AIC has a right to negotiate, on its own behalf, the purchase of a 10% interest [19] in Mapco's U.S. refining and marketing assets. (D.I. 1 at ¶¶ 20–22.) "AIC requests this Court to determine and declare ... that AIC is entitled to negotiate such 10% purchase upon the same terms and conditions [20] as set forth in the [Consulting] Agreement...." (D.I. 1 at ¶ 22 [footnote added].) In the alternative, Count III requests an award for the amount of profits foregone by AIC as a result of its inability to purchase a 10% interest in Mapco's U.S. assets. (*Id.*)

In Count IV of the Complaint, AIC seeks an award of damages for the amount of fees and commissions to which it *would have* been entitled *if* Mapco had consummated the proposed asset sale transaction during the two-year term of the consulting agreement. (D.I. 1 at ¶¶ 23–25.) That is, AIC requests a fee of $.045 per barrel for crude oil delivered pursuant to a *hypothetical* long-term supply agreement. Moreover, AIC asks for a commission equal to 10% of the consideration receivable by Mapco from a *hypothetical* sale of an interest in its U.S. refining and marketing assets.

Counts I and IV are mutually exclusive alternatives. (*See* D.I. 1 at ¶ 25; D.I. 26 at 7.) Count IV seeks a measure of damages to be calculated and awarded presently. Count I seeks a present declaration that such damages shall be measured and awarded at some future date.

In Count V, AIC seeks a declaration that it be entitled to continue its efforts [21] as Mapco's consultant and representative in negotiating the proposed asset sale trans-

action. (D.I. 1 at ¶¶ 26–27.) The substance of Count V is a request for a declaration that the consulting agreement remains in force, notwithstanding Mapco's purported termination of the agreement on October 14, 1988.

Count V is a mutually exclusive alternative to Counts I, III, and IV. (D.I. 1 at ¶ 27; D.I. 26 at 7.) If AIC were permitted to regain its position as Mapco's consultant and representative, as sought by Count V, then a grant of any of the other remedies requested in Counts I, III, and IV, would be to confer duplicate relief upon AIC.

### B. *Counts Relating to a Short–Term Supply Contract*

Recalling that the Complaint's alleged causes of action are divisible into two distinct classes, the second class is embodied within Count II. Count II arises not out of the contemplated asset sale transaction, but instead, out of a short-term supply contract allegedly formed between Mapco and NNPC. (*See* D.I. 1 at ¶¶ 16–19.)

In Count II, AIC avers that:

[a short-term supply] contract commenced in mid–1988 and continues at this time. *Prior to mid–October 1988,[22] Mapco paid AIC a fee* of U.S. $0.045 per barrel purchased as the [Consulting] Agreement required. *Since that date,* Mapco has made no payments to AIC although it has continued to purchase crude from NNPC....

(D.I. 1 at ¶ 17 [emphasis and footnote added].)

By way of Count II, AIC seeks an award of damages, in the amount of $.045 per barrel, on deliveries of oil to Mapco pursu-

---

**18.** Discussion of Count II is deferred for the moment. It is described in detail below. *See* Part II.B. of this Opinion, *infra.*

**19.** The Court notes that the consulting agreement provides not for a fixed 10% interest, but rather, for "an option to purchase an interest, *not to exceed* 10%." (D.I. 1, Ex. A at 2 [emphasis added].)

**20.** The Complaint's allusion to the "terms and conditions" of the consulting agreement refers to the express conditions precedent to AIC's

exercise of the purchase option. These conditions precedent are detailed in Part I.B. of this Opinion, *supra.*

**21.** In view of Mapco's termination of the consulting agreement, it would be perhaps more fitting for AIC to request to *renew,* rather than to *continue,* its efforts.

**22.** Mid–October, 1988, or more precisely October 14, 1988, coincides with Mapco's termination of the consulting agreement. *See supra* text accompanying notes 14–16.

ant to the alleged short-term supply contract. (D.I. 1 at ¶¶ 17, 19.) Plaintiff does not, of course, request an award of those fees for which it has already been paid. (*See* D.I. 26 at 17 (in its brief in opposition to Mapco's motion to dismiss, AIC states that it "has made no claim as to payments [already] made" by Mapco).) Since the Complaint alleges that Mapco paid the proper fees through mid–October, 1988— i.e. until Mapco's termination of the consulting agreement—Count II requests fees only for post-termination shipments under the alleged short-term supply contract.

### III. ANALYSIS

In considering a motion to dismiss for failure to state a claim, the Court must presume that all factual allegations in the Complaint are true, and must draw all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Rogin v. Bensalem Township,* 616 F.2d 680, 685 & n. 14 (3d Cir.1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); 2A J. Moore, J.D. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 12.07[2.–5], at pp. 12–63 to 12–65 (2d ed. 1987). Dismissal is appropriate only where it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *American Original Corp. v. Legend, Inc.,* 652 F.Supp. 962, 964 (D.Del.1986) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)). Although the moving party must overcome a formidable burden, Mapco has met its burden in this case. For the reasons detailed below, the Court finds that AIC has utterly failed to state a claim upon which relief can be granted.

■■■■■ As noted in Part I.E. of this Opinion, *supra,* the consulting agreement expressly provides that it "shall be governed by and construed in accordance with the laws of the State of Delaware." (D.I. 1,

Ex. A at 13.) In diversity cases such as this one, a federal court applies the conflict of laws rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Under Delaware law, express choice of law provisions in contracts are generally given effect. *Wilmington Trust Co. v. Wilmington Trust Co.,* 26 Del.Ch. 397, 24 A.2d 309, 313 (Del. Supr.1942); *Falcon Tankers, Inc. v. Litton Systems, Inc.,* 300 A.2d 231, 234–35 (Del. Super.1972); 6 *Del. C.* § 1–105(1). Accordingly, this Court shall recognize the contract's choice of law clause, and will apply Delaware substantive contract law in interpreting and enforcing the terms of the consulting agreement.

#### A. *Legal Sufficiency*

The causes of action alleged in AIC's Complaint are divisible into two classes. The first class, which consists of Counts I, III, IV, and V, involves those terms of the consulting agreement relating to the contemplated asset sale transaction. The legal sufficiency of these claims will first be analyzed by the Court in Part III.A.1. of this Opinion, *infra.* The Court will then consider, in Part III.A.2., *infra,* the adequacy of the second class of claims—contained in Count II—arising out of the alleged short-term supply contract.

##### 1. Counts I, III, IV and V

Counts I, III, IV, and V are all based upon the same alleged wrongdoing; they simply seek different forms of relief. The claims underlying these counts essentially derive from the following four-part syllogism, which alleges: (1) that Mapco wrongfully impeded[23] AIC's efforts to negotiate and successfully bring about the proposed asset sale transaction with its corresponding long-term crude oil supply provision; (2) that as a result thereof, Mapco did not enter into the contemplated asset sale transaction within the prescribed two-year

---

23. The Complaint does not specify *how* Mapco hindered or prevented AIC's performance. In *Triology Variety Stores, Ltd. v. City Products Corp.,* 523 F.Supp. 691 (S.D.N.Y.1981), the court dismissed plaintiff's claim that defendant wrongfully hindered or prevented plaintiff's contractual performance, because the complaint failed to allege *how* plaintiff had been hindered or prevented. *Id.* at 694–95.

period; (3) that Mapco's termination of the consulting agreement after two years—which obviously would otherwise have been permissible absent Mapco's alleged interference with AIC—was therefore improper; and (4) that AIC therefore was wrongfully deprived of compensation under the consulting agreement.

■ Lurking behind AIC's theory is the so-called "prevention doctrine." "The 'prevention doctrine' provides that a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party *wrongfully prevented*[24] performance of that condition precedent." *Mobile Communications Corp. of America v. MCI Communications Corp.,* No. 8108, 11 Del.J.Corp.L. 680, 685, 1985 WL 11574 (Del.Ch. Aug. 27, 1985) (emphasis and footnote added).

> One who *unjustly* prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition. He will not be permitted to take advantage of his own *wrong,* and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was pr[e]mised. One who himself induces the failure of the other to perform within the time agreed upon can not take advantage of such failure....

3A A. Corbin, *Corbin on Contracts* § 767, at pp. 540–41 (1960) (emphasis added, footnote omitted). Other authorities contain similar descriptions of the prevention doctrine. *See, e.g., District–Realty Title Ins. Corp. v. Ensmann,* 767 F.2d 1018, 1023 (D.C.Cir.1985) (the prevention "doctrine excuses a condition precedent when a party *wrongfully prevents* the condition from occurring" [emphasis added]); *Shear v. National Rifle Ass'n of America,* 606 F.2d 1251, 1254–55 (D.C.Cir.1979); *Restatement (Second) of Contracts* § 245 (1979); 5 S. Williston, *A Treatise on the Law of Contracts* § 677A, at p. 234 (3d ed.1961) ("justice ... precludes a promisor from taking

advantage of a condition, the performance of which he himself prevented").

Translating the prevention doctrine into the context of the instant case would produce the following rule. A promisor (i.e. Mapco) may not escape contractual liability (i.e. the payment of compensation to AIC under the consulting agreement) by reliance upon the failure of a condition precedent (i.e. formation of the proposed asset sale transaction) where the promisor *wrongfully prevented* the occurrence of that condition precedent.

There is a well recognized exception to the prevention doctrine, however, which forcefully applies in this case. The Court of Chancery of Delaware has held that "the prevention doctrine does not apply where, under the contract, one party *assumes the risk* that fulfillment of the condition precedent will be prevented." *Mobile Communications Corp. v. MCI,* 11 Del.J.Corp.L. 680, 686 (emphasis added). *See also District–Realty v. Ensmann,* 767 F.2d at 1023–24 ("[W]hen a contract 'authorizes' a party to prevent a condition from occurring, 'there is no prevention.' ... The essential inquiry is whether or not the contract *allocated the risk* of" nonoccurrence of the condition. [emphasis added]); *Shear v. National Rifle Ass'n,* 606 F.2d at 1256 ("the prevention doctrine does not apply when the contract, in effect, authorizes prevention"); *Dixon v. Bernstein,* 182 F.2d 104, 105 (D.C.Cir.1950); 3A *Corbin on Contracts* § 767, at p. 545 ("there are some cases in which some sort of prevention or interference is contemplated by the parties as quite proper and within the privileges of the promisor"); 5 S. Williston, *A Treatise on the Law of Contracts* § 677A, at p. 235 ("[a]n exception to [the prevention doctrine] must be made where the hindrance is due to some action of the promisor which under the terms of the contract ... he was permitted to take"). *Cf. Restatement (Second) of Agency* § 453 comment a (1958) (in the context of a brokerage contract, "the parties are bound by the bargain which

---

**24.** The key operative language in the definition of the prevention doctrine is the term "wrongfully prevented." If, as here, defendant's alleged "prevention" is authorized by the contract, then naturally it does not constitute a breach and cannot be considered "wrongful."

they make and if, adverting to the possibility of termination before performance is completed, they provide that no compensation shall be given for merely part performance, such agreement is enforced").

The prevention doctrine can have no application to this case. The consulting agreement provides, in unambiguous and painstakingly crafted language, that Mapco had no duty whatsoever to enter into any of the contemplated underlying transactions, such as the proposed asset sale. It explicitly provides that "nothing [therein] requires [Mapco] to enter into any agreement with the Nigerian Government and/or NNPC or to sell any or all of its Refining and Marketing Assets." (D.I. 1, Ex. A at 2.) AIC, having agreed to be contractually bound by such language, cannot be heard to now argue that Mapco's failure to consummate the asset sale transaction *wrongfully prevented* AIC from earning its compensation under the consulting agreement. The consulting agreement is susceptible to but one reasonable reading: that AIC *assumed the risk* that Mapco would opt not to form the contemplated asset sale transaction. AIC's prevention argument is thus without merit.

It is perhaps something of a misnomer to characterize the foregoing "assumption of risk" rule as an *exception* to the prevention doctrine. "[P]revention is a breach of contract. A corollary of this definition is that there is no prevention when the contract authorizes a party to prevent a condition from occurring." *Shear v. National Rifle Ass'n,* 606 F.2d at 1256. *See also Restatement (Second) of Contracts* § 245 comment a ("The [prevention doctrine] only applies ... where the lack of cooperation constitutes a breach.... There is no breach if the risk of such a lack of cooperation was assumed by the other party or if the lack of cooperation is justifiable.").

The consulting agreement now in dispute expressly conferred complete discretion upon Mapco as to whether or not it would ever consummate the contemplated asset sale transaction.[25] Therefore its failure to

consummate such a transaction is not a breach, and cannot be labeled as "wrongful prevention."

To summarize, Mapco had every right, under the clear-cut language of the consulting agreement, to decline to form the contemplated asset sale transaction. As such it acted completely within its rights when it terminated the consulting agreement after two years had elapsed with no asset sale having been consummated. (*See* D.I. 1, Ex. A at 8 [authorizing termination, "with or without cause," if no asset sale transaction was concluded within 730 days of execution of the consulting agreement].)

The ramifications of Mapco's proper termination of the consulting agreement are two-fold. First, the termination foreclosed AIC's right to receive any future remuneration under the consulting agreement.[26] Hence the compensation AIC requests by way of Counts I, III, and IV, cannot be awarded. The second notable feature of Mapco's termination of the consulting agreement is that it required AIC to "immediately discontinue any and all representation direct or implied on behalf of [Mapco]." (D.I. 1, Ex. A at 2.) Consequently, the relief sought by AIC in Count V cannot be granted. In Counts I, III, IV, and V, AIC has failed to state a claim upon which relief may be granted.

### 2. Count II

Count II of AIC's Complaint (D.I. 1 at ¶¶ 16–19) relates to the short-term supply contract allegedly formed by Mapco, rather than the contemplated asset sale transaction which lies at the root of Counts I, III, IV, and V. By the terms of the consulting agreement, Mapco committed to pay AIC a fee of $.045 per barrel for oil shipped pursuant to such a short-term supply contract. (D.I. 1, Ex. A at 6.)

AIC acknowledges that Mapco paid AIC the requisite fee of $.045 per barrel until mid–October, 1988. (D.I. 1 at ¶ 17.) As of that time, however—concurrent with Mapco's termination of the consulting agree-

---

**25.** *See* Part I.C. of this Opinion, *supra.*

**26.** *See supra* notes 6 and 11 and accompanying text.

ment [27]—AIC claims that the fee payments ceased, even though oil deliveries continued under the short-term supply contract. (D.I. 1 at ¶ 17.) In Count II of the Complaint, AIC requests as damages an award of $.045 per barrel for post-termination oil shipments.[28]

The claims asserted by AIC in Count II cannot succeed, as a matter of law. While AIC alleges that Mapco has only failed to pay AIC's commissions on post-termination oil shipments, the consulting agreement expressly provides that no such post-termination commissions are to be paid. Plaintiff's claims are undercut by the very precise terms of the consulting agreement. "If this Agreement is terminated . . ., then [Mapco] shall have no obligation to pay to AIC any amount not already paid by [Mapco]." (D.I. 1, Ex. A at 10.) "In the event this Agreement is terminated . . ., besides any other legal remedies available to [Mapco], AIC agrees to forfeit and [Mapco] shall not have to pay AIC the per barrel fee on any barrels [Mapco] lifts and exports after the date of termination of the Agreement." (D.I. 1, Ex. A at 7.)

In view of the foregoing provisions, combined with the fact that Mapco was contractually empowered to terminate the consulting agreement after two years,[29] which power it exercised in mid–October, 1988,[30] it is evident that no relief can be had by AIC under Count II of the Complaint. It follows that Count II must be dismissed under Rule 12(b)(6), Fed.R.Civ.P.

Thus all five of the counts in AIC's Complaint—Counts I, III, IV, and V, relating to the proposed asset sale; and Count II, arising out of the short-term supply contract—have failed to state a claim upon which relief can be granted, and shall therefore be dismissed.

### B. *Ripeness*

In the alternative, besides failing to state a legally cognizable claim, three of the counts in AIC's Complaint must be dismissed for the additional reason that they are not ripe for judicial review.

■ Federal courts are constitutionally constrained to decide only actual cases and controversies. *See* U.S. Const. art. III. Advisory opinions are not permitted. The rationale of the ripeness doctrine is to avoid premature adjudication, by preventing courts from entangling themselves in abstract disagreements involving contingent future events which may not occur as anticipated, or indeed which may not occur at all. *Thomas v. Union Carbide Agricultural Prod. Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 3332–33, 87 L.Ed.2d 409 (1985); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

For the reasons set forth below, the Court finds that the claims presented in Counts I, III, and IV of the Complaint are abstract and hypothetical. Resolution of these claims at this time would be premature, and would contravene the ripeness doctrine.

The consulting agreement between AIC and Mapco is fundamentally a brokerage arrangement. AIC agreed to facilitate a contemplated transaction between Mapco and a third party. AIC's compensation under the consulting agreement hinged upon the successful consummation of the underlying transaction between Mapco and the third party.[31] The compensation sought by AIC—an award for which is requested in Count IV of the Complaint—is thus, in substance, a brokerage commission.[32] Ac-

---

**27.** (*See* D.I. 1, Ex. B [Contract Termination Notice, effective October 14, 1988].)

**28.** *See* Part II.B. of this Opinion, *supra.* Additionally, AIC seeks a declaration that it is entitled to a like fee for any further shipments under the short-term supply contract made subsequent to the judgment date. (D.I. 1 at ¶ 19.)

**29.** *See* Part I.D. of this Opinion, *supra.*

**30.** (D.I. 1, Ex. B.)

**31.** *See* Part I.B. of this Opinion, *supra.*

**32.** The Court observes that this case differs in at least one respect from the prototypical brokerage dispute. Generally the broker makes initial contact with a prospective purchaser, who is unknown to the principal at the outset of the brokerage arrangement. In this case, however, the prospective third parties (i.e. the Nigerian Government and NNPC) were known to Mapco at the time AIC was engaged. In fact the con-

cordingly, the Court must look to the Delaware law of brokers in order to determine whether AIC's claim for commissions is ripe.

The general rule is that a broker may recover a commission only when it is the *procuring cause* of a *consummated transaction*. *Nepa v. Marta*, 348 A.2d 182, 184 (Del.Supr.1975); *B–H, Inc. v. "Industrial America", Inc.*, 253 A.2d 209, 213 (Del. Supr.1969); *Canaday v. Brainard*, 51 Del. 226, 144 A.2d 240, 244 (Del.Supr.1958); *Stoltz Realty Co. v. Hanby*, 1988 WL 24441, at 6–7 (Del.Ch. March 16, 1988). Under the general rule, there are thus two elements to a successful claim for a commission: (1) procuring cause,[33] and (2) a consummated transaction.

In addition to the general rule, the courts of Delaware have fashioned two exceptions by which a commission may also be recovered. In essence, the two exceptions describe situations in which a broker is entitled to a commission, even though one or the other of the two elements for recovery under the general rule is lacking.

The first exception may apply where the "procuring cause" element of the general rule is not satisfied: a broker may be entitled to a commission, even though it is not the procuring cause, if after producing the prospect the broker was dismissed by its principal *in bad faith as a device to avoid the commission. B–H, Inc. v. "Industrial America"*, 253 A.2d at 213; *Slaughter v. Stafford*, 51 Del. 168, 141 A.2d 141, 145 (Del.Supr.1958); *BDB Partnership v. Rehoboth Realty, Inc.*, 1988 WL 55317, at 8 (Del.Super. May 26, 1988), *aff'd*, 549 A.2d 699 (Del.Supr.1988). *Cf. Dougherty v. Durham*, 249 A.2d 748, 748–49 (Del.Super. 1969) ("*absent a bad faith* attempt to deprive a broker of his commission, an owner may discharge a broker at any time after expiration of the original term of the agen-cy agreement" [emphasis added] ). Implicit in this first exception is a requirement that the contemplated sale transaction underlying the brokerage arrangement actually take place at some point in time. Otherwise, there would hardly be a need for the principal to employ "a device to avoid the commission." *See Canaday v. Brainard*, 144 A.2d at 246 ("if ... talks [initiated by the broker] had resulted in *the sale that finally took place*, and [the principal] had refused to pay a commission, [then the broker's] claim of discharge in bad faith to avoid payment of commissions would probably have been made out" [emphasis added] ); *Slaughter v. Stafford*, 141 A.2d at 145 (a principal "cannot dismiss the broker *on the eve of a successful [completion] of negotiations* in order to evade the payment of commissions" [emphasis added] ).

There is a second exception to the general rule that a brokerage commission is earned only where there is both procuring cause and a consummated transaction. The second exception, where applicable, circumvents the "consummated transaction" element. If a broker produces a prospect *ready, willing, and able to meet his principal's expressed terms*, the commission is earned regardless of whether or not the transaction is thereafter consummated. *Nepa v. Marta*, 348 A.2d at 184; *B–H, Inc. v. "Industrial America"*, 253 A.2d at 213; *Slaughter v. Stafford*, 141 A.2d at 143; *BDB Partnership v. Rehoboth Realty*, 1988 WL 55317, at 8.

■ There are thus three theoretically possible avenues by which AIC might attempt to recover the commission claimed in Count IV of the Complaint, relating to the proposed asset sale transaction: (1) the general rule; (2) the first exception; and (3) the second exception. Starting with the second exception, AIC cannot possibly re-

sulting agreement repeatedly refers to the Nigerian Government and NNPC by name. It cannot be said that AIC discovered the prospective buyers as the result of a diligent and time-consuming search, with Mapco riding on its coattails all the while.

**33.** The term "procuring cause" appears to be synonymous with "proximate cause" in this con-text. If the broker's efforts in producing the prospective buyer form the "first link in a direct chain of causation" ultimately leading to the consummation of the transaction, then the broker is deemed to be the procuring cause of the transaction. *See, e.g., B–H, Inc. v. "Industrial America"*, 253 A.2d at 214.

cover under this theory because it would require production by AIC of a prospect ready, willing, and able to meet Mapco's expressed terms. Here there is no allegation that Mapco ever expressed any terms of the proposed asset sale transaction which it would be obliged to accept. In fact quite to the contrary, the consulting agreement specifically states that Mapco was not obligated to conclude any transaction with the Nigerian Government and/or NNPC (D.I. 1, Ex. A at 2), and that the contemplated transactions were to be "on terms acceptable to" Mapco. (D.I. 1, Ex. A at 3.) AIC could not have produced a prospect ready, willing, and able to meet Mapco's expressed terms, because Mapco never expressed any such terms.[34] Thus the second exception cannot conceivably support the commissions requested in Count IV of AIC's Complaint.

As for the general rule and the first exception, the discussion above indicates that these theories of entitlement to a brokerage commission each would require that the contemplated asset sale transaction actually took place. Here, however, there is no allegation that such a transaction has taken place. In fact AIC's Complaint concedes that the asset sale transaction has not occurred, claiming instead that negotiations to that end continue. (D.I. 1 at ¶ 9.) As far as the record reveals, such a transaction may never be consummated. AIC's claim, contained in Count IV, for a brokerage commission under either the general rule or under the first exception thereto, cannot be ripe for judicial resolution unless and until the contemplated asset sale transaction is actually consummated. Count IV will therefore be dismissed upon the additional ground that it is not ripe for review by this Court, as an alternative to the ground for dismissal described in Part III. A.1., *supra*, that it fails to state a claim upon which relief can be granted.

■ Count I of the Complaint, which seeks declaratory relief, likewise is not ripe for review. In Count I, AIC requests the Court to declare that *if* Mapco should conclude, in the future, an asset sale transac-

tion as contemplated by the consulting agreement, then AIC would be entitled to receive fees and commissions as if the consulting agreement had not been terminated.

By their very nature declaratory judgments are, in a sense, forward-looking. Of course this fact does not mean that all requests for declaratory relief are infirm for want of ripeness. *See generally* 6A J. Moore, J.D. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 57.04 (2d ed. 1987). Count I, however, suffers from additional deficiencies which warrant its dismissal on ripeness grounds.

Even if the contemplated asset sale transaction is consummated at some future date, AIC would still not necessarily be entitled to a brokerage commission, and hence granting the requested declaratory judgment would be premature. AIC would have to demonstrate its entitlement to a brokerage commission on the basis of either the general rule or the first exception thereto highlighted above. As for the general rule, AIC would have to show, *inter alia*, that it was the *procuring cause* of the consummated transaction. If on the other hand AIC chose to pursue its commission under the first exception to the general rule, it would then have to prove that Mapco dismissed AIC *in bad faith as a device to avoid the commission*. The inquiry in either case (i.e. under the general rule or under the first exception) would require the Court to consider evidence relating to *future* events.

For example, in evaluating whether or not AIC was the procuring cause of the asset sale transaction, the Court would have to determine whether there was ever a substantial break in negotiations between Mapco and the Nigerian Government and/or NNPC. *See, e.g., Nepa v. Marta,* 348 A.2d at 184; *B–H, Inc. v. "Industrial America",* 253 A.2d at 214; *Canaday v. Brainard,* 144 A.2d at 244. Such a break in the negotiations might occur at some *future* date, subsequent to the filing of this

**34.** *See supra* note 9.

action but prior to consummation of an asset sale by Mapco.

Deciding whether Mapco acted in bad faith as a device to avoid the commission would also require the Court to consider evidence of events which have not yet occurred. For instance the amount of time to elapse before consummation of the asset sale transaction would be highly relevant to the inquiry of whether AIC's dismissal was a mere artifice employed by Mapco to escape a duty to pay commissions.

In summary, even if the contemplated asset sale transaction eventually occurs, there is still no guaranty that AIC would be entitled to a brokerage commission. Such an inquiry would turn, at least in part, on contingent future events unknown at this time. Hence the declaratory judgment sought in Count I, like the award of damages sought in Count IV, fails for lack of ripeness. This ground for dismissal is an alternative to the other ground discussed in Part III.A.1., *supra* —namely, failure to state a claim upon which relief can be granted.

▮ Finally, Count III of the Complaint is similarly flawed. In Count III AIC requests the opportunity to exercise its option to purchase an interest of up to 10% in Mapco's U.S. refining and marketing assets. However as recounted in Part I.B. (*AIC's Remuneration*) of this Opinion, *supra*, AIC's right to exercise its purchase option was expressly subject to at least three preconditions. Nowhere in the record does AIC allege that any of the three preconditions have occurred. Count III could not be ripe for review by this Court unless and until AIC alleges that the three conditions precedent to its right to exercise its purchase option have been satisfied. Thus Count III must be dismissed, not only because it fails to state a claim, but in the alternative, because it is not ripe.

## IV. CONCLUSION

AIC's Complaint contains four counts relating to a contemplated asset sale transaction (Counts I, III, IV, and V), and one count arising out of a short-term oil supply contract (Count II). For the reasons set forth in Part III.A.1. of this Opinion, *supra*, the Court concludes that the four counts relating to the proposed asset sale transaction must be dismissed for failure to state a claim. Likewise, the Court will dismiss Count II because it too fails to state a claim upon which relief may be granted. *See* Part III.A.2., *supra*. Finally, three of the counts (Counts I, III, and IV) must be dismissed for the alternative reason that they are not ripe for judicial review. *See* Part III.B., *supra*.

Defendant Mapco's motion to dismiss will therefore be granted. The Court shall dismiss AIC's Complaint in its entirety. The various other motions relating to discovery matters will be denied as moot.

## FINAL ORDER

For the reasons set forth in the Court's Memorandum Opinion entered in this action on this date, it is

ORDERED, ADJUDGED, AND DECREED that:

1. Defendant's motion to dismiss plaintiff's complaint in its entirety (Docket Item ["D.I."] 15) is hereby granted.

2. Defendant's motion to stay discovery (D.I. 15) is hereby denied as moot.

3. Defendant's motion for an order that depositions of defendant's officers not be taken until after taking the deposition of plaintiff's chairman, Mr. Harry Akande (D.I. 15), is hereby denied as moot.

4. Plaintiff's motion for a protective order in scheduling Mr. Akande's deposition (D.I. 16) is hereby denied as moot.

5. Plaintiff's application for letters rogatory (D.I. 21) is hereby denied as moot.